## TEXAS & N. O. R. CO. v. WARDEN.
### No. 2651.

Court of Civil Appeals of Texas. El Paso.
April 14, 1932.

Rehearing Denied May 6, 1932.

J. C. Fuller, of Marfa, and Kemp & Nagle, of El Paso (Baker, Botts, Andrews & Wharton, of Houston, of counsel), for appellant.

S. Engelking, of San Antonio, for appellee.

PELPHREY, C. J.

This is an appeal from a judgment of the district court of Presidio county, Tex., in favor of appellee, administratrix of the estate of John E. Warden, deceased, who sued for herself individually and for the benefit of herself as surviving widow of John E. Warden, deceased, and also as next friend of the surviving child, and also for the benefit of the surviving father and mother of the said Warden, deceased. There was later a dismissal taken as to the father and mother.

Appellee, as plaintiff, alleged that John E. Warden, deceased was on the 18th day of November, 1929, employed by appellant as a brakeman, and that it was his duty to load and unload freight and couple and uncouple cars in freight trains; that the said Warden was run over and killed by a stock car at Marfa, Tex., on said date, in connection with the operation and movement of a freight train, and that his death resulted directly from the negligence of appellant, its officers, agents, and employees; that deceased was ordered to uncouple a string of cars at a point ten cars distant from the locomotive, for the purpose of loading said ten cars with cattle at the stock pens near Marfa; that deceased swung and rode on the handhold and step on the south side of a stock car in the string of cars being switched on the north stock track; that, while so doing, his body was carried against another stock car standing on a track known as the south stock track, diverging from the south side of said north stock track; that he was knocked between the cars, falling on the track, and was run over and killed; that appellant was negligent in placing and leaving the stock car on the south stock track in such close proximity to the north stock track as to strike deceased as he was riding on the south side of the cars being switched on the north stock track; and that such negligence directly caused and directly contributed to the death of deceased.

Damages were prayed for in the sum of $47,500.

Appellant answered by general demurrer, special exceptions, general denial, and specially pleaded that deceased did not use proper care in the manner in which he was doing the work; specially denied that he used ordinary care to avoid being injured; that he wholly failed to use the care required of him by law; and alleged that the exact manner in which he met his death was unknown to it, there being no eyewitnesses to the accident; and that deceased assumed the risks incident to the work he was doing in spotting the cars, and therefore could not recover.

In response to special issues the jury found that deceased, immediately before his death, was riding on the handholds and steps of a stock car on the north stock track, for the purpose of uncoupling the first ten cars; that he was struck by the most easterly car on the south stock track while thus riding; that appellant, or its employees, were negligent in leaving the most easterly stock car on the

south stock track in the position in which it was left with respect to the north stock track; that such negligence was the proximate cause of the death of John E. Warden; that deceased did not know of nor appreciate the danger arising from the position of the car on the south stock track; that the position of the car, and the danger arising therefrom, was not so obvious that an ordinarily prudent person, situated as Warden was, would have observed and appreciated such position and danger; and that $30,000, if paid in cash, would be a fair and reasonable compensation to the widow and child of deceased; $21,600 to the widow and $8,400 to the child.

Judgment was rendered against appellant for $30,000, and it has appealed.

### Opinion.

It is agreed by appellee that appellant and deceased were engaged in Interstate Commerce at the time of the accident, and that the Federal Employers' Liability Act (45 US CA §§ 51–59) will control the decision of this case. Appellant's contentions, in substance, are: (1) That the court should have instructed a verdict in its favor because there was no evidence showing negligence on its part; (2) that the verdict was not supported either by the law or the evidence; (3) that it was against the overwhelming preponderance of the evidence; (4) that the evidence was insufficient to warrant the submission of the issues; and (5) that the court erred in placing the burden upon appellant to establish the affirmative of the issues on assumed risk. The first question to which we shall address our attention is that of the sufficiency of the evidence to show negligence on the part of appellant.

In our consideration of the evidence, it is our duty to consider that evidence most favorable to appellee, and place upon it the most favorable construction.

It appears from the evidence that at the place where the accident occurred, the main line of appellant runs practically east and west; that appellant maintains, about a mile east of Marfa and north of the main line, stock pens with a chute leading therefrom to what is known as the north stock track; that some distance west of the chute what is known as the south stock track leads off on the south side of the north stock track and extends a distance west before again joining it; that on the date of the accident there were some 15 stock cars standing on the south stock track and about 45 empty stock cars being switched on the north stock track; that the 45 cars were brought onto the north stock track from the east end thereof with the engine on the east end of the cars; that the locomotive pushed the 45 cars west past the stock pens for the purpose of cutting off the first ten cars west of the engine in order

that they might be spotted opposite the chute to there be loaded with cattle; that deceased's part of the movement was to uncouple the said ten cars from the remaining cars when the car next to the engine was opposite the chute; that, after the first car was opposite the chute, the body of deceased was found under the east wheel of the west truck of the tenth car, the west wheel having passed over his body, the upper part of his body being north of the south rail on the north stock track and the lower part being on the south side; that the car under which deceased's body was found was opposite the most easterly car standing on the south stock track. There appears no dispute in the evidence as to the facts above related, and it was agreed that stock cars range from 36 to 40 feet in length. As to the distance from the northeast corner of the most easterly car on the south stock track to the wall of a car passing on the north stock track there is considerable difference of opinion. Ben Pruitt testified that the car on the south stock track was from 40 to 45 feet from the frog of the north stock track, and that the space between that car and the cars on the north stock track just about permitted his shoulders to pass through. Turner testified that the distance between the walls of the cars was, according to his estimate, 24 inches. Both these witnesses testified to having passed between the cars after the accident. We therefore, under the rule that the evidence most favorable to support the judgment shall only be considered, must conclude that the northeast corner of the car on the south stock track was close enough to have struck deceased if he was riding on the handholds and steps of a car on the north stock track, and that appellant and its employees were negligent in leaving it in such position.

The jury, if there was any evidence to show that he was riding on the side of a car on the north stock track, would certainly be justified in finding that he was struck by the car on the south track, in view of the fact that there is absolutely nothing in the record to suggest that he fell from the handhold and steps and under the wheels from any other cause.

The next question is whether there is evidence sufficient to show that deceased was riding on the side of a car on the north stock track:

Deceased was not within the view of any one at the time he was killed, and therefore his position just before his death must be ascertained from circumstances alone.

Turner testified that, the last time he saw Warden alive, he was on top of the cars about opposite the chute, and that the cars were moving at the time. Oscar Roberts testified that he too, while standing on the chute, between the time the first car passed the chute and the time Warden was killed, saw a man

on the top of the string of cars as it was being shoved westward, but that he was talking to some others there at the time and paid very little attention.

As we understand the record, the string of cars, when first shoved in on the north stock track, was stopped several car lengths east of the chute, and Warden, who was then riding on top of the cars, got down and went over to Sims, the conductor, borrowed some matches, and received orders to go west on the north stock track and uncouple the first ten cars. Turner, who was up near the engine, but the evidence does not show his exact position, testified that he saw Warden on the cars opposite the chute, and that the cars were being shoved westward at the time. It is therefore reasonable to conclude, and the jury was justified in believing, that the time when Turner saw Warden on top of the cars was not before they reached the chute and before he went over to Sims, but was after Warden had borrowed the matches and received his instructions from Sims.

Roberts testified that the man he saw on top of the cars was a fat man and wore a mustache, and, while the other evidence shows that Warden was a man of average size and was slender, it is silent as to whether he wore a mustache or not; yet, Roberts having said that he paid very little attention, and the evidence showing that the man he saw could not have been any other member of the crew, the jury could have reasonably concluded that the man Roberts saw was the deceased.

This evidence showing that deceased, after talking to Sims, was on top of the cars, there being no dispute as to his later being found under the wheels of the tenth car, and, the evidence showing that there had been no attempt made to uncouple the tenth car from the other cars, it would naturally follow that Warden had either fallen from the top of the car, or while making his way down therefrom. He being on top of the cars it became necessary for him, in order to perform the duty imposed upon him, to alight therefrom, and if, in doing so, the car from which he was alighting should pass a car on another track, with a space of only 24 inches between them, it would take no great stretch of the imagination to realize that he would be knocked loose from the side of the car on which he was riding, and especially would this be true when his body was found less than twenty feet west of the east end of the car on the adjoining track, and there was evidence of his body having been dragged or rolled several feet east of where his body was found and only a few feet west of the corner of the other car.

■ The testimony of Conductor Sims disproves, if believed, that the accident happened in this way, but the jury had him before them, and, being the judges of the credibility of the witnesses, were in a much better position than are we to decide what part of his testimony to believe and what part to disregard. His testimony, to say the least, as it appears in the narrative form of the statement of facts, is very confusing and unsatisfactory, and, it appears to us, that the jury would have been clearly justified in disregarding the whole of his testimony. One striking example of its confusing character is that he testified that Warden walked down to the cars on the south stock track and while standing there was engaged in counting off the ten cars as they passed him. This whole statement could not possibly be true, as Sims' own testimony shows that the ten cars never passed the east end of the cars on the south track.

While we shall not here detail his evidence, still there are other instances in which there appears the same confusion and uncertainty.

■ From what has been said it follows that appellant was not entitled to an instructed verdict because of the insufficiency of the evidence to show that it was guilty of negligence, and that such negligence, if any, was the proximate cause of Warden's death.

■ Does the evidence here show that Warden, under the facts of this case, was injured and killed as a result of a risk and danger incident to the work he was doing? In this connection appellant directs our attention to the record which, it contends, shows that before Warden's death he had passed along between the moving cars and the northeast corner of the car on the south stock track to receive orders from Conductor Sims, and therefore had notice of the position of the cars.

Conductor Sims testified, relative to the actions of deceased, as follows: "After the crew notified me they were going to eat dinner here, Mr. Warden said, 'I am going on out to the stock pens and locate my cars.' Some of them were bedded and some were not. We went out there and later I saw him. He came up between this outside track and the middle track and he told me where I could get the bedded stock cars."

Appellant, under these propositions, does not quote any particular evidence as bearing out its above contention, and, as far as we have been able to ascertain from a reading of the statement of facts, the above-quoted testimony is the only evidence on the subject. It will readily be seen that it does not bear out the statement above quoted. In the first place, Sims does not say that Warden passed between the moving cars and the northeast corner of the car on the south stock track, but merely says that "he came up between this outside track and the middle track and he told me where I could get the bedded stock cars."

There is nothing in the record to show that the cars to which the engine was attached ever passed west of the stock pens and were ever on the north track opposite the most easterly car on the south stock track until after Warden had borrowed the matches from Sims and been instructed as to cutting of the ten cars. From the testimony of Sims it appears that Warden's coming up to him between the tracks was prior to the time when he borrowed the matches, and therefore at a time when there were no cars on the north stock track west of the stock pens.

Granting that Warden came up between the north and south stock tracks past the cars which were then on the south track, but with no cars on the north track, would the situation be so plainly observable to the decedent that his later getting on the side of a car being switched past the cars on the south track constitute a risk which he assumed? We think not. In our opinion an ordinarily prudent man might, under such circumstances, not have observed the lack of clearance between the cars and the south rail on the north track.

The facts here are entirely different from those in Grand Trunk Western Railway Company v. Reid (C. C. A.) 42 F.(2d) 403, and Southern Pacific Company v. Berkshire, 254 U. S. 415, 41 S. Ct. 162, 65 L. Ed. 335, and are therefore not controlling.

The trial court instructed the jury as follows:

"The burden of proof is on the plaintiff to establish by a preponderance of the evidence, that is, by the greater weight of credible testimony, the affirmative of the Issues 1, 2, 3 and 4, and the amount of damages, if any, to which the widow and the child are entitled to under Issue No. 7.

"The burden is on the defendant to establish by a preponderance of the evidence, that is, by the greater weight of credible testimony, the affirmative of Issues 5 and 6."

■ Appellant further contends that the action of the court in charging the jury that the burden of proof was on appellant to establish the affirmative of issues 5 and 6 was clearly an indication to the jury of what the effect of their findings would be, and therefore improper and reversible.

In the trial court appellant interposed the following objection to this portion of the charge: "Defendant objects to that paragraph on Page 4, beginning with the words 'the burden of proof' and ending with the words 'Issue No. 7' for the reason that the same is in the nature of a general charge in a case submitted on Special Issues and defendant makes the same objections to the paragraph on page five of said charge begin-

ning with the words 'burden of proof' and ending with the words 'Issues 5 and 6.'"

From the above it appears that the objection now urged by appellant was not made in the trial court, and therefore cannot now be raised.

On the question of assumed risk, it should also be borne in mind that the facts here do not involve a permanent structure as was true in the cases cited.

No reversible error having been pointed out by appellant, the judgment of the trial court is affirmed.