**TEXAS & N. O. R. CO. v. WARDEN.**
No. 3550.

Court of Civil Appeals of Texas. El Paso.
May 27, 1937.

Rehearing Denied June 24, 1937.

452

Baker, Botts, Andrews & Wharton, of Houston, Kemp, Nagle & Smith, of El Paso, and Fuller, Swearingen & Bledsoe, of Marfa, for appellant.

S. Engelking, of San Antonio, for appellee.

WALTHALL, Justice.

This suit was brought by Mrs. Elsie Warden, administratrix of the estate of her deceased husband, John E. Warden, as plaintiff, for the benefit of herself as surviving wife, and of the surviving child, Dorothy Jean Warden, of herself and the said John E. Warden, a girl aged twelve or fourteen years. The suit is against Texas & New Orleans Railroad Company, as defendant, for damages by reason of the death of her husband, John E. Warden, near the stock pens, about a mile east of the town of Marfa, on November 18, 1929. The deceased, Warden, was an employee of the defendant railroad company as brakeman on the freight train then engaged in interstate commerce, in the operation of backing a string of 45 cars in a westerly direction on a track known as the north stock track near the stock pens; the freight train conductor, C. L. Sims, ordered Warden to uncouple the string of cars at a point 10 cars distant from the locomotive for loading the 10 cars with cattle at the stock pens.

It is alleged that Warden, in the execution of Conductor Sims' order to uncouple the cars, was swinging and riding on the south side of a stock car in the string of cars, and that, while Warden was so riding, his body was carried against another stock car standing on a track known as the south stock track, and which south side stock car was diverging from the south side of the north stock track, and that Warden was by said diverging stock car knocked from his position between the cars so that he fell on the track and was run over by one of the wheels of the moving cars and killed.

Plaintiff assigned as negligence on the part of defendant as proximately causing the death of her husband, the leaving of the diverging stock car on the south stock track at a point where it converged into the main or north stock track, and so close thereto that Warden swinging upon the car going westward was knocked from his position and killed.

Defendant answered by general demurrer, special exceptions, general denial, contributory negligence, assumed risk, and risk of which Warden knew.

The court overruled defendant's motion for an instructed verdict in its favor.

On issues submitted the jury found: The position of the car occupying the most easterly position on the south stock track at which Warden was given orders to cut 10 cars from the train was different from the position of the most easterly car on the south stock track at the time Warden and Turner threw the west derail; that the deceased, John E. Warden, immediately before his death, was riding on the handholds and steps of a stock car on the north stock track for the purpose of uncoupling the first ten cars; the deceased, John E. Warden, was struck by the most easterly car on the south stock track while he was riding on a car on the north stock track; it was negligence on the part of defendant company, or its employees, to leave the most easterly stock car on its south stock track in the position in which it was left with respect to the north stock track at the time of this accident; such negligence was a proximate cause of the death of John E. Warden; John E. Warden did not know of and appreciate the danger arising from the position of the most easterly car on the south stock track; the position of the most

easterly car on the south stock track, and the danger arising therefrom was not so obvious that an ordinarily prudent person, situated as Warden was situated at the time, would have observed and appreciated the danger, if any.

The jury found that the sum of $25,000 would be a fair and reasonable compensation for the pecuniary loss to plaintiff and her child resulting to them from the death of Warden, and apportioned the sum found between plaintiff and her daughter.

The court overruled the objections of defendant to the charge and defendant duly excepted.

The court received the jury's verdict and entered judgment in the sum found by the jury and apportioned by the jury, in favor of plaintiff and against defendant.

The court overruled defendant's original and amended motions for a new trial, and defendant duly prosecutes this appeal.

### Opinion.

This is the second trial of this case. The general facts of the case are found in the opinions on the former trial, 49 S.W.(2d) 486, by this court, and in 125 Tex. 193, 78 S.W.(2d) 164, 166, by the Commission of Appeals, reviewing and reversing the case, and to which we refer for a more extended statement of the general facts than we think necessary to give here.

The parties stipulated on the trial that the deceased, Warden, at the time of his death was in the employ of defendant as a brakeman, and that he and defendant at that time were engaged in interstate commerce, and that Mrs. Elsie Warden was administratrix of the estate of her deceased husband, John E. Warden, and was authorized by the probate court of Medina county to prosecute this suit.

On the former appeal the Commission of Appeals reversed and remanded the case, the opinion holding, in effect, that the evidence being circumstantial was not sufficient to sustain the finding of the jury and the judgment based thereon. On this second trial the evidence is sufficient, we think, to justify the submission and to sustain the jury's findings of negligence on the part of the defendant company, or its employees, in leaving the most easterly stock car on its stock track in the position in which it was left with respect to its north stock track at the time of the accident in which Warden was killed, and that such negligence was the proximate cause of the death of Warden, assuming that Warden was killed by being knocked from his position while riding on the side of the car on the north stock track, by the easterly stock car, referred to as the offending or projecting car, on the south stock track, as found by the jury.

While the strings of cars were standing on the north stock track and on the south stock track apparently as they were at the time of the accident, a witness walked between the standing cars on the north stock track and the most easterly car on the south stock track (the offending car), and testified, in effect, that the space between the cars on the two tracks was about 25 inches. From other witnesses who estimated the width of the space, it was stated to be as much as 3 feet or more. We accept that space as approximately the space between the two cars on the tracks as the cars stood on the tracks shortly after the accident.

Now, as we understand from the record, a number of cars, some 10 in number, were to be cut and spotted for loading from a string of some 45 cars; this string of cars was moving west when Conductor Sims directed Brakeman Warden to cut off a stated number of cars behind the engine, and as the string of cars moved west indicated to Warden where the cut in the moving train was to be made; Warden started going west with the moving train. From that time on the evidence as to the action or movement of Warden is conflicting. We are not concerned as to the conflict in the evidence nor as to the difference in the evidence of the witnesses on the former trial and the last trial; that is a matter exclusively for the jury, they being the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given to their testimony, as instructed by the trial court. We look to the evidence on the trial to see whether the evidence on the whole is sufficient to justify the submission of the issues to the jury, and whether the evidence submitted is sufficient to sustain the facts found by the jury.

One of the crucial facts submitted and found by the jury on this trial, as we view it, is inquiry no. 2: "Do you believe and find from a preponderance of the evidence that the deceased, John E. Warden, immediately before his death, was riding on the handholds and steps of a stock car on the north stock track, for the purpose

of uncoupling the first ten cars?" To which the jury answered, "Yes."

One other of the findings is to the effect that Warden was struck by the most easterly car on the south stock track while he was riding on a car on the north stock track, and issues of negligence in leaving the offending car, the most easterly car on the south stock track, and the proximate cause of the death of Warden.

Warden's body was found immediately west of where the train moving west passed the point of the most easterly car on the south stock track. His body was lying across the south rail of the stock track, the second wheel of the west truck being across his chest. There was much evidence as to the circumstances surrounding the body at the place where found, whether the body was shoved or dragged on the ground west, the distance his hat was found from his body, etc.

The evidence shows that no person other than trainmen were seen on or about the train in its movements in spotting the cars for loading. Warden was rear brakeman and J. M. Turner was front brakeman on the train in question.

C. F. James, brakeman on the train, testified by deposition: Was at the stockpens and saw Warden just before and after he was killed; were switching cars for loading; moving about 45 cars west on the north stock track; the most westerly car of the 45 cars was a little east of the stock pens when the movement westward began; Warden rode down and got off at the pens where Conductor Sims was. Sims, Warden, and witness were there; heard Sims direct Warden the number of cars to cut off for loading, and Sims pointed to where the cut would be; Sims instructed witness where to spot the head car to be loaded. Warden then proceeded west with the train counting the cars.

J. M. Turner testified: Saw Warden on top of the train moving west when opposite the stock pens; saw three men on the ground opposite the stock pens; recognized Sims as one of the three; could not from where he was distinguish the other two. Said the next thing he noticed as he walked along over ballast and rocks and ties, "one man riding down on the side of the car, and one man standing right here (pointing to spot in neighborhood of west chute), and conductor Sims was standing right here (pointing to spot not far from west chute)."

Question: "One man was doing what?" Answer: "One man was riding on the cars with his body extended this way (witness indicated by extending arms full length in front of him and hands at elevation of his eyes, standing and looking back)."

Question: "Where were his feet?" Answer: "Undoubtedly in the stepladder."

Question: "Mr. Turner, you saw this man riding on the side of the train?" Answer: "Yes, sir."

Witness then, in answer to questions, said James was standing opposite the chute getting ready to spot a car, had his hands out "like this (indicating), giving an easy stop for the engineer; when that easy signal is given to spot a car, the car is about a car length away." At that particular moment witness did not observe a man on the side of the car, and did not see that man any more; witness said he did not look any more; said the train was coming to a stop, and stopped; James and Sims were standing there looking west, acted excited, Sims walked hurriedly west, then ran, and then James ran; witness ran, all going west; Sims stopped and gave a signal to the engineer, and continued a hurried movement west to about 30 feet of the north east corner of the eastern car on the middle track, stopped, looked under the train, motioned the engineer, and started climbing over the cars; about that time witness got to where Sims and James were; Sims said, "Wait men, I have killed one of my men." Witness saw Warden's body lying across the south rail of the main stock track, the west trucks of that car. Witness then said the train men came and all noted the conditions there, "and looked as to the cause of him having been run over, noting all the conditions;" stated the indentations on the ground, dragging mark, etc.

Defendant's proposition questions the sufficiency of the evidence to justify the submission of the issues to the jury, and the findings of the jury on the issues submitted.

The evidence is uncontroverted that Conductor Sims directed Warden to cut off at the tenth car, and that James was to spot the head car; that Warden and

James each proceeded to perform the service. The train of 45 cars was slowly moving west at the time, and, it could be but a short time until a signal was expected from Warden on the west end; none came—the head car that James was to spot passed the point; James reported that he had no signal from Warden. Sims and James then went to west to ascertain the reason why no signal was given, and found Warden's body under the car.

It becomes a very important question on the liability of the defendant as to what caused Warden's death. Turner testified that he saw a man riding on the side of one of the moving cars, looking toward the engine. He could not identify the man as Warden from where he was, but it seems to us that from all the uncontroverted facts the jury could well infer that the man was Warden; the man was at the place in the moving train just where Warden could be expected to be at that time; it is nowhere suggested in the record that the man, if there was a man riding on the train as testified, was other than Warden. We think it was not reversible error to submit the issue to the jury.

We have already considered the issues of negligence in leaving the most easterly stock car on its south stock track in the position shown.

■ The court submitted and the jury found that Warden was struck by the most easterly car on the south stock track while riding on a car on the north stock track.

The evidence on this trial is very similar to the evidence on the former trial on the issue as to whether Warden was knocked from his position on the side of the car. In this case on former appeal, Judge Critz, for the Commission of Appeals, said: "It is undisputed that no witness saw Warden riding on the handholds and steps of the car on the north stock track, no witness saw him struck by the car on the converging end of the south stock track, and no witness saw him fall or be dragged or knocked across the rail of the north stock track. It thus appears that there is no direct evidence in this record sustaining this verdict and judgment." Judge Critz then states the rules of direct and circumstantial evidence; says that facts not seen or heard may be presumed or taken for granted from other proven facts or circumstances, and says,

however, that other proven facts or circumstances to establish a fact, the main fact sought to be proved must follow as a natural or very probable sequence from the facts actually proven.

No witness saw Warden knocked from the side of the car on which witness Turner saw him riding. Turner was the only witness who testified that Warden, at any time, rode on the handholds of the car, though other witnesses were nearer to Warden, and were watching for signal from Warden. We must and do accept Turner's statement that a man was riding on the handholds and steps of the car, as did the jury, and that the man was Warden. Turner's evidence, however, does not necessarily place Warden, while riding, at the narrow space between the offending car on the south stock track and the car on which he was riding on the north stock track, nor does Turner's evidence show the probable distance or time Warden was riding on the handholds of the car, so that the jury could find with any degree of certainty that Warden was at or opposite the projecting car, while riding on the handholds of the car, or that Warden, necessarily, was knocked from the car by the projecting car.

There are no proven fact or facts or circumstances which necessarily establish the fact that Warden was knocked from his position on the steps and handholds on the car on which he was riding by the projecting car. For that reason, the case must be reversed and remanded.

■ In giving the charge on "proximate cause," the court included in the charge the term "any new, intervening, independent cause," and did not define the term "intervening, independent cause." Defendant complained of the omission to define the term.

The court should have defined the term on objection made to its omission in the charge. Texas Rev.Civil Statutes, article 2198; Phoenix Refining Co. v. Tips, 125 Tex. 69, 81 S.W.(2d) 60; Texas & Pacific Ry. Co. v. Mercer (Tex.Com.App.) 90 S. W.(2d) 557, 106 A.L.R. 1299; Orange & N. W. R. Co. v. Harris (Tex.Sup.) 89 S.W.(2d) 973; Robertson & Mueller v. Holden (Tex.Com.App.) 1 S.W.(2d) 570, holding that objecting party need not prepare charge defining term "new independent cause," but it becomes the duty of the court to do so.

We do not hold that it was necessary, under the evidence, to have used the phrase or a phrase of similar meaning, in defining "proximate cause," but the term "new, intervening, independent cause," having been used, we think it should have been defined.

For reasons stated, the case is reversed and remanded.